UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

|  |  |
|---|---|
| GARY MONTGOMERY, | |
| Plaintiff, | Case No. 3:19-cv-00675 |
| v. | Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Alistair E. Newbern |
| WELLPATH MEDICAL, et al., | |
| Defendants. | |

To:     The Honorable Waverly D. Crenshaw, Jr., District Judge

**<u>REPORT AND RECOMMENDATION</u>**

This civil rights action brought under 42 U.S.C. § 1983 and other federal and state laws arises from pro se Plaintiff Gary Montgomery's pretrial detention in the custody of the Davidson County Sheriff's Office (DCSO). (Doc. No. 78.) Montgomery alleges that Defendants Wellpath Medical, LLC (Wellpath), the Metropolitan Government of Nashville and Davidson County (Metro), Lieutenant Thomas Conrad, Nurse Taylor Wall, Nurse Amber Dame, Nurse Dayna West, Nurse Mark Bailey, Dentist Krystal Lewis, and Dental Technician Jenny Jaynes denied him adequate medical and dental care while he was detained in violation of the Eighth and Fourteenth Amendments, the Americans with Disabilities Act, 42 U.S.C. § 12101, the Rehabilitation Act, 29 U.S.C.A. § 701, and state laws. (*Id.*)

Conrad filed a motion for summary judgment on Montgomery's claims against him. (Doc. No. 152.) Montgomery filed a response in opposition to Conrad's motion (Doc. No. 168), Conrad filed a reply (Doc. No. 171), and Montgomery filed a sur-reply (Doc. No. 82).

Wellpath, Metro, Wall, Dame, West, Bailey, Lewis, and Jaynes (collectively, the Wellpath and Metro Defendants) also moved for summary judgment. (Doc. No. 156.) Montgomery filed a response in opposition to their motion. (Doc. No. 166.) The Wellpath and Metro Defendants filed a reply (Doc. No. 169), and Montgomery filed three sur-replies (Doc. Nos. 167, 178, 183).

Conrad filed a motion to supplement his motion for summary judgment and to continue the trial date (Doc. No. 193), which Montgomery has not opposed. This motion will be granted as unopposed by separate order.

For the reasons that follow, the Magistrate Judge will recommend that the motions for summary judgment be granted and that all other pending motions be denied as moot.[1]

## I.     Background

### A.     Factual Background[2]

The following facts are undisputed for purposes of summary judgment except where noted.

Montgomery has been in DCSO custody since May 5, 2016. (Doc. No. 78.) Wellpath is the health and dental care provider for inmates in DCSO custody at the Davidson County Jail in Nashville, Tennessee. (*Id.*) Wall, Dame, West, Bailey, Lewis, and Jaynes worked at the Davidson

---

[1]     Montgomery has filed motions for summary judgment against Conrad (Doc. No. 172) and against the Wellpath and Metro Defendants (Doc. No. 176). Because the recommended grant of the defendants' motions for summary judgment would necessarily render Montgomery's motions moot, the Magistrate Judge has not addressed those motions in this Report and Recommendation.

[2]     The facts in this section are drawn from Montgomery's unverified second amended complaint (Doc. No. 78), Conrad's statement of undisputed material facts, declarations, and exhibits (Doc. Nos. 152-1–152-11, 154), the Wellpath and Metro Defendants' statement and reply statement of undisputed materials facts, declaration and exhibits (Doc. Nos. 159, 159-1, 159-2, 160, 170), Montgomery's responses to the Wellpath and Metro Defendants' statements of undisputed material facts (Doc. Nos. 166, 168) and his additional statement of disputed material facts (Doc. No. 168). Montgomery's second amended complaint is unsworn and its allegations are included only to provide relevant context. *See Burley v. Sumner Cnty. 18th Jud. Drug Task Force*, No. 3:19-cv-00118, 2021 WL 852194, at *4 (M.D. Tenn. Feb. 17, 2021*), report and recommendation adopted,* 2021 WL 848714 (M.D. Tenn. Mar. 5, 2021)..

2

County Jail from at least May 2016 to July 2019, which is the timeframe of the events that are the basis of Montgomery's claims. (*Id.*) Montgomery was housed in a restrictive housing unit (RHU) under either administrative or disciplinary status from January 2019 to July 2019. (Doc. Nos. 152-8, 152-9, 154, 168.)

### 1. Dental Care

Montgomery states that he received a medical screening when he was admitted to DCSO custody but did not receive a dental screening "within [ten] days of [his] admission" as DCSO policy requires. (Doc. No. 78; Doc. No. 166, PageID# 1288.) Montgomery "did not complain of a dental condition" during his intake process. (Doc. No. 160, PageID# 1258, ¶ 1; Doc. No. 166.)

Lewis and Jaynes conducted Montgomery's first in-custody dental examination on June 21, 2017, after Montgomery requested treatment for a "broken tooth and [temperature] sensitivity." (Doc. No. 78, PageID# 379, ¶ 15.) Lewis and Jaynes noted that Montgomery had multiple decayed teeth and mild gingivitis and evaluated his oral hygiene as fair. (Doc. No. 159-1.) Montgomery asked Lewis and Jaynes for a dental cleaning and a crown to repair a broken tooth. (Doc. No. 78.) Both requests were refused, and Jaynes told Montgomery, "We don't clean teeth here, we only pull them." (*Id.* at PageID# 379, ¶ 16.) Montgomery states that Jaynes offered to extract Montgomery's broken tooth, but Montgomery declined. (Doc. No. 78.) Lewis informed Montgomery that treatment of chronic symptoms was not available at the jail and advised him to put in a sick call if his teeth became symptomatic. (Doc. No. 159-1; Doc. No. 160.) Having been told that extraction was the only treatment offered, Montgomery "continue[d] to tolerate the sensitivity discomfort" through 2018. (Doc. No. 78, PageID# 380, ¶ 17.) Montgomery "refused dental care" on March 1, 2018. (Doc. No. 160, PageID# 1259, ¶ 2; Doc. No. 166.)

Montgomery received a second dental examination from Lewis and Jaynes on June 3, 2019. (Doc. Nos. 78, 160, 166.) Montgomery states that "it was noted that the gaps in [Montgomery's]

gums were larger as measured with a probe and that they were bleeding" and that "excessive calcified tarter build up was present." (Doc. No. 78, PageID# 380, ¶ 18.) Lewis informed Montgomery that he had "multiple missing and decayed teeth" and "severe" gingivitis and "poor" oral hygiene. (Doc. No. 159-1, PageID# 1138; Doc. No. 160, PageID# 1259, ¶ 4.) Montgomery states that he "again requested [that] his teeth be cleaned, the gums treated[,] and a crown be put on the broken tooth to save it and help with the sensitivity." (Doc. No. 78, PageID# 380, ¶ 18.) Jaynes responded that "[t]his is a short term facility and we only offer a limited service, but you can have dental services when you go to prison" and told Montgomery that she would "see [him] again next year." (*Id.*) Medical records show that Lewis informed Montgomery that treatment of chronic symptoms was not available at the jail, advised him to place a sick call if his teeth became symptomatic, and recommended that he "seek dental care for comprehensive exam once [he] is released from DCSO custody." (Doc. No. 159-1, PageID# 138; Doc. No. 160, PageID# 1259, ¶ 4.) Montgomery states that he was eventually offered a dental cleaning after giving his complaint in this action to a case manager for copying. (Doc. Nos. 78.)

Montgomery was again seen by Lewis on July 26, 2019, for general debridement of his "arch left and right quadrants." (Doc. No. 159-1, PageID# 1136; Doc. No. 160.) "Gross plaque and calculus [were] removed" and his maxillary arch was flossed. (Doc. No. 159-1, PageID# 1136.) Lewis "rescheduled [Montgomery] for general debridement of lower right [quadrant]" at a later time. (*Id.*) A dental progress note shows that Montgomery "refused [to attend his] scheduled dental appointment for debridement" on October 17, 2019. (*Id.* at PageID# 1135.) On the same day, Montgomery reported "[s]harp" "[t]hrobbing" "[i]ntermittent" tooth pain and sensitivity to heat and cold. (*Id.* at PageID# 1219.) On October 23, 2019, Lewis performed a

4

"general debridement" of Montgomery's teeth and scheduled him for an annual exam. (*Id.* at PageID# 1134.)

### 2. Back and Stomach Pain

Montgomery alleges that he experiences chronic back pain and made requests on March 5, 2019, and March 10, 2019, for a higher-quality mattress and blanket in restricted custody, where he was being housed. (Doc. No. 78.) His requests were denied on grounds that "medical is unable to issue mats/blankets." (Doc. No. 159-1, PageID# 1194.)

Montgomery states that, in mid-April 2019, he "began experiencing excruciating stomach and back pain equivalent to having a kidney stone, which made sleeping nearly impossible." (Doc. No. 78, PageID# 381, ¶ 21.) Despite making several sick call requests and telling Wall, Dame, and other nurses about his pain, Montgomery "was not seen by a doctor or nurse practitioner until about June 18, 2019." (*Id.* at PageID# 382, ¶ 22.) Montgomery states that nurse Yvonne Brown often told him that "there is nothing we can do for you." (*Id.* at PageID# 381, ¶ 21.) Montgomery was instead told to put in a sick call. (Doc. No. 78.) The Wellpath and Metro Defendants state that "medical records do not reflect [that] [Montgomery] made a sick call [request] regarding stomach or back pain complaints in April 2019. (Doc. No. 160, PageID# 1261–62, ¶ 14.)

On March 1, 2019, Montgomery requested additional Tylenol and Mobic for his back pain and was seen by Bailey on March 4, 2019, who refiled his prescription. (Doc. Nos. 160, 166.) Montgomery was again evaluated by Bailey in mid-June 2019, and Bailey prescribed the muscle relaxant Flexeril, which Montgomery states was delivered two days after the visit. (Doc. No. 78; Doc. No. 160.) While Montgomery was awaiting his medication, he asked Wall "what was taking so long" and told her that he "was in continuous non-stop severe pain." (*Id.* at PageID# 383, ¶ 25.) Wall responded that she could not get Montgomery's medication for him and that he was "not the only person here [she] ha[d] to take care of." (*Id.*) Montgomery received five of the ten prescribed

doses of Flexeril on June 20, 2019. (Doc. Nos. 78, 159-1, 160.) He requested additional medication, but the order was delayed for nearly two weeks because Montgomery's first prescription had expired. (*Id.*) Montgomery treated his pain during that time with nonsteroidal anti-inflammatory drugs (NSAIDs), including Tylenol, aspirin, and Mobic. (*Id.*)

Around September 4, 2019, Montgomery "collapsed due to internal bleeding," was diagnosed with "a hole in his stomach area," and received "several endoscopy surgeries to stop the bleeding." (Doc. No. 78, PageID# 385, ¶ 31.) At Metro Nashville General Hospital, Montgomery was "diagnosed with a GI bleed and duodenal ulceration." (Doc. No. 160, PageID# 1267, ¶ 37; Doc. No. 166.) Montgomery asserts that Wellpath medical staff caused this condition by issuing him too many NSAID medications. (Doc. No. 78.)

### 3. Nail Care

Montgomery states that he "is a known diabetic with ingrown nails" and that, because of his diabetes, "it is imperative that [he] take extremely good care of [his] feet for fear of losing them." (Doc. No. 78, PageID# 383, ¶ 26.) Medical records reflect that Montgomery has Type 2 diabetes. (Doc. Nos. 152-1, 159-1.) Montgomery had eight comprehensive foot examinations from 2016 to 2019, including three in 2019, and medical staff completed a Comprehensive Diabetes Foot Examination Form for each exam. (Doc. No. 152-1, PageID# 767; Doc. No. 159-1.)

Montgomery also requested and received nail cutting services on twelve occasions in 2019. (Doc. Nos. 152-10, 159-1.) Montgomery received nail cutting services on April 26, 2019, but states that "Conrad ordered staff and nurses to keep [Montgomery's] hands connected to a belly chain" that made it difficult to cut his fingernails and impossible to reach his toenails. (*Id.* at PageID# 383, ¶ 26.) Montgomery alleges that his toenails became ingrown and painful (*Id.* at PageID# 384, ¶ 27.) Montgomery then requested that West help him dig out and trim his ingrown toenails but she refused, stating "Ew, I'm not going to cut those[.]" (*Id.*) Other nurses had refused

to cut Montgomery's nails because "it was against policy" (*id.*) and told Montgomery that Conrad had ordered staff and nurses not to allow "'the nurses assigned to nail cutting duty into the building'" where Montgomery is housed (*id.* at PageID# 385, ¶ 29).

Conrad disputes these allegations, stating that "[m]edical staff, including those assigned to nail clipping, have an office in the Maximum Correctional Complex" where Montgomery is housed and that "[he] do[es] not control whether medical staff have access to the building, and [that] at no time did [he] issue any orders to DCSO employees or medical staff to not allow nurses into the building." (Doc. No. 152-3, PageID# 777, ¶ 12.) Conrad states that, according to DCSO policies, "all inmates housed in the RHU are required to be in full restraints while outside of their cells, which includes leg irons and hand cuffs attached to a belly chain." (Doc. No. 152-3, PageID# 776, ¶ 5.) Conrad also states that inmate nail-clipping requests are "retrieved by medical staff who then schedule the service," and "DCSO employees are not made aware of when or how frequently an inmate submits [a request for] nail clipping services" or "what an inmate writes, if anything, on [these forms]." (*Id.* at PageID# 777, ¶¶7, 8.)

## B. Procedural History

### 1. Pleadings

Montgomery initiated this action on July 24, 2019, by filing a complaint alleging violations of his Eighth and Fourteenth Amendment rights under 42 U.S.C. § 1983; claims under 42 U.S.C. §§ 1985 and 1986, and the Americans with Disabilities Act (ADA); and claims of negligence, breach of contract, and conspiracy under Tennessee law. (Doc. No. 1.) The Court granted Montgomery's motion to proceed *in forma pauperis* and screened the complaint under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A and 42 U.S.C. § 1997e. (Doc. Nos. 9, 10.) The Court found that Montgomery had stated colorable claims for deliberate indifference to his serious medical needs under the Fourteenth Amendments against Metro, Wellpath, and "Jenny Denest" in her individual

capacity for denial of dental services after June 3, 2019; against five then-unknown nurse defendants (the Doe Nurses) in their individual capacities for failure to provide timely treatment for back pain and refusal to treat his ingrown toenails; and against Conrad in his individual capacity for refusing to allow Montgomery to have his nails cut, allowing Montgomery to cut his nails only while shackled, and delaying Montgomery's nail care by denying nurse access to Montgomery's housing area. (Doc. No. 9.) The Court also allowed Montgomery's state law negligence claims based on the failure to treat his medical and dental needs to proceed. (*Id.*) It dismissed all other claims and defendants. (*Id.*)

On February 26, 2020, Montgomery filed a motion for leave to amend his complaint to provide the full name of one Doe Nurse and the first names of the other four Doe Nurses and to add claims against Bell. (Doc. Nos. 11, 12.) The Court denied Montgomery's motion to amend as moot, finding that he could amend his complaint as of right under because no defendant had yet filed a responsive pleading. (Doc. No. 31.)

Montgomery then filed a motion requesting that the Court order Wellpath to provide the full names of Doe Nurses. (Doc. No. 35.) The Court construed Montgomery's request as a motion for limited discovery to obtain that information and granted the motion. (Doc. No. 39.) Montgomery filed a second amended complaint naming as defendants Wellpath, Metro, Conrad in his individual and official capacities; and Bell, Wall, Dame, West, Bailey, Lewis, and Jaynes in their individual capacities. (Doc. No. 78.)

Metro and Conrad moved to dismiss all of Montgomery's claims against them under Federal Rule of Civil Procedure 12(b)(6). (Doc. Nos. 82, 84.) The Magistrate Judge entered a report and recommendation recommending that the Court dismiss Montgomery's § 1983 claims against Metro based on Montgomery's requests for prophylactic teeth cleaning and a crown and

his requests for a better mattress and blanket, Montgomery's ADA and Rehabilitation Act claims, and Montgomery's claims for IIED, breach of contract, and negligence under Tennessee law; that the Court dismiss Montgomery's IIED claims against Conrad and all claims brought against Conrad in his official capacity; and that the Court deny Metro and Conrad's motions with respect to Montgomery's other claims. (Doc. No. 127.) The Court approved and adopted the Magistrate Judge's report and recommendation. (Doc. No. 130.)

On February 24, 2023, the Court dismissed without prejudice Montgomery's claims against Bell under Federal Rule of Civil Procedure 4(m) for failure to effect service of process. (Doc. Nos. 144, 148.)

All defendants have now filed motions for summary judgment that are ripe for adjudication. (Doc. Nos. 152, 156.)

## 2.     Conrad's Motion for Summary Judgment

On October 27, 2023, Conrad filed a motion for summary judgment under Federal Rule of Civil Procedure 56 (Doc. No. 152) supported by a memorandum of law (Doc. No. 153), a statement of undisputed material facts (Doc. No. 154), and several declarations and exhibits (Doc. Nos. 152-1–152-11). Conrad argues that he is entitled to summary judgment because Montgomery has not established that suffering ingrown toenails as a diabetic constitutes a sufficiently serious medical need and that there are no genuine disputes of material fact that Conrad was not deliberately indifferent to Montgomery's serious medical needs when he ordered Montgomery to be restrained while cutting his nails. (Doc. No. 153.)

9

Montgomery filed a response in opposition to Conrad's motion for summary judgment and statement of undisputed material facts[3] arguing that Conrad is not entitled to qualified immunity and that Conrad "knew [Montgomery] was in pain and ordered officers to keep [Montgomery] in full restraints with hands attached at the belly, forcing [Montgomery] to remain in pain for several more weeks because [he] was able to ease his toenail pain." (Doc. No. 168, PageID# 1314.) Montgomery concedes that "ingrown nails alone perhaps [are] not a serious need" but argues that his claims "arise[ ] in the combination of being diabetic and all the serious foot concerns[,]" (*Id.* at PageID# 1317.) Montgomery also argues that "[he] is a disabled person under ADA and Rehabilitation Act" and "strongly disagrees" with Conrad's argument that Montgomery cannot assert claims under these statutes. (*Id.* at PageID# 1315.)

Conrad filed a reply in support of his motion. (Doc. No. 171.) Montgomery then filed a "response to Conrad's reply in support of [Conrad's] motion for summary judgment." (Doc. No. 182, PageID# 1413.)

### 3.  The Wellpath and Metro Defendants' Motion for Summary Judgment

On October 30, 2023, the Wellpath and Metro Defendants filed a motion for summary judgment (Doc. No. 156) supported by a memorandum of law (Doc. No. 158), a statement of undisputed material facts (Doc. No. 160), and several exhibits (Doc. Nos. 159, 159-1, 159-2). In their motion for summary judgment, the Wellpath and Metro Defendants argue that there are no genuine disputes of material fact that Wall, Dame, West, Bailey, Jaynes, and Lewis were not deliberately indifferent to Montgomery's serious medical needs or that Wellpath and Metro's policies and procedures were not the moving force behind Montgomery's alleged constitutional

---

[3]     Montgomery styled his filing as a "reply in opposition to Conrad's statement of undisputed material facts and opposition to the motion for summary judgment[.]" (Doc. No. 168, PageID# 1311.) The Court construes this filing as a response in opposition.

violations. (Doc. No. 158.) They also argue that they are entitled to summary judgment as a matter of law on Montgomery's claims for: (1) breach of contract against Wellpath; (2) negligence against Wellpath, Lewis, Jaynes, and Bailey; (3) medical negligence against Wellpath, Lewis, and Bailey; (4) IIED against Wellpath; and (5) ADA and Rehabilitation Act violations against Wellpath and West. (*Id.*)

Montgomery filed a response in opposition to the Wellpath and Metro Defendants' motion for summary judgment and statement of undisputed material facts and provided a statement of additional disputed facts. (Doc. No. 166.) The Wellpath and Metro Defendants filed a reply in support of their motion for summary judgment and a reply to Montgomery's response to their statement of material facts. (Doc. Nos. 169, 170.)

Montgomery then filed three supplemental documents over the course of two months further responding to the Wellpath and Metro Defendants' reply. (Doc. Nos. 167, 178, 183.) Montgomery first filed a "supplemental reply [in] opposition" arguing that he can establish claims under the ADA and Rehabilitation Act, that jail staff were deliberately indifferent to his serious medical needs with respect to his ingrown toenails, and that Wellpath violated its own policies with respect to dental and health care. (Doc. No. 167, PageID# 1304). Montgomery then filed a "response to defendants' reply of plaintiff's response to" these defendants' statement of undisputed material facts correcting his failure to provide specific record citations in his response to the defendants' statement of undisputed material facts and making additional arguments against summary judgment. (Doc. No. 178, PageID# 1393.) Finally, Montgomery filed a "response to defendant[s'] . . . reply in support of motion for summary judgment" responding to the defendants' argument that Montgomery did not address their argument that they are entitled to summary

judgment on Montgomery's IIED, breach of contract, medical negligence, and bedding-related claims. (Doc. No. 183, PageID# 1418.)

## II.     Legal Standard

In resolving a motion for summary judgment, the Court must undertake "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citation omitted); *see also Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 282 (6th Cir. 2012) ("Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))). The parties "must support" their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or,

alternatively, by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). Courts must view the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). However, if the moving party carries its initial burden, the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position. *Anderson*, 477 U.S. at 252. In order to proceed to trial, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id.*

## III.    Analysis

### A.    Local Rule 56.01 and the Defendants' Initial Burden Under Federal Rule of Civil Procedure 56

This Court's Local Rule 56.01 provides that "any motion for summary judgment . . . must be accompanied by a separate, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial." M.D. Tenn. R. 56.01(b) (statement of undisputed material facts). Under this rule, "[e]ach fact must be set forth in a separate, numbered paragraph [and] . . . must be supported by specific citation to the record." *Id.* Any party opposing a motion for summary judgment must specifically respond to each asserted fact by: "(1) Agreeing that the fact is undisputed; (2) Agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) Demonstrating that the fact is disputed. Each disputed fact must be supported by specific citation to the record." M.D. Tenn. R. 56.01(c) (response to statement of facts). Furthermore, "[t]he response must be made on the document provided by the movant or on another document in which the non-movant has reproduced the facts and citations verbatim as set forth by the movant" and "must be filed with the papers in opposition to the motion for summary judgment." *Id.* Pro se parties are not excused from complying with these rules. *See*

M.D. Tenn. R. 56.01(b)–(c). Indeed, the Court's scheduling order in this action instructed the parties to "refer to Federal Rule of Civil Procedure 56 and Local Rule 56.01 for summary judgment procedures[,]" described Local Rule 56.01's requirements, and warned the parties that "[f]ailure to respond in opposition to a statement of material fact may result in the Court assuming that the fact is true for purposes of summary judgment." (Doc. No 149, PageID# 756); *see also* M.D. Tenn. R. 56.01(f) (failure to respond) ("If a timely response to a moving party's statement of material facts . . . is not filed within the time periods provided by these rules, the asserted facts shall be deemed undisputed for purposes of summary judgment.").

### B. Montgomery's Sur-Replies

Montgomery filed three unauthorized sur-replies to the Wellpath and Metro Defendants' motion for summary judgment (Doc. Nos. 167, 178, 183) and a sur-reply to Conrad's motion for summary judgment (Doc. No. 182) without the Court's leave. In these filings, Montgomery makes additional arguments against summary judgment on all his claims.

The Federal Rules of Civil Procedure and this Court's Local Rules do not recognize a response to a reply brief (or sur-reply) as a filing that can be made without the Court's leave. Accordingly, because Montgomery did not seek the Court's permission to file these sur-replies, the Court will not consider them in resolving the pending motions for summary judgment. *See Brisbane v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, No. 3:19-cv-00884, 2022 WL 524769, at *1 n.2 (M.D. Tenn. Feb. 22, 2022) ("declin[ing] to consider" plaintiff's response to defendant's reply filed "without requesting or receiving permission to do so" "because such filing is not allowed under the Local Rules, (especially in the absence of a motion for leave to file a sur-reply)").

### C. Conrad's Motion for Summary Judgment

"Section 1983 provides a civil enforcement mechanism for all inmates who suffer constitutional injuries at the hands of '[a]ny person acting under color of state law.'" *Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 494 (6th Cir. 2008) (alteration in original) (quoting 42 U.S.C. § 1983). To prevail on a § 1983 claim, a plaintiff must show "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010)). Montgomery alleges that Conrad was deliberately indifferent to his serious medical needs in violation of his Fourteenth Amendment.

Conrad has not disputed that he is a state actor for purposes of liability under § 1983, and the Court finds that, as a jail official, Conrad acted under color of state law within the meaning of the statute. *See Cox v. Draper*, No. 2:20-CV-00081, 2022 WL 4137281, at *5 (M.D. Tenn. Sept. 12, 2022) (finding that jail administrator and jail corrections officer acted under color of state law and were therefore persons subject to suit under § 1983) (citing *Meadows v. Putnam Cnty.*, No. 2:19-cv-00006, 2020 WL 1532311, at *3 (M.D. Tenn. Mar. 31, 2020)).The only question remaining at summary judgment is whether there are genuine issues of material fact that Conrad deprived Montgomery of his constitutional rights.

Montgomery alleges that Conrad violated his Eighth Amendment right to adequate medical care while he was in pre-trial detention. The Eighth Amendment, which applies to state governments through the Fourteenth Amendment, "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Berkshire v. Beauvais*, 928 F.3d 520, 535 (6th Cir. 2019) (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004)). Pretrial detainees like Montgomery "have a constitutional right to be free from deliberate indifference to serious medical

needs under the Due Process Clause of the Fourteenth Amendment." *Greene v. Crawford Cnty.*, 22 F.4th 593, 605 (6th Cir. 2022). Federal courts have long recognized that a pretrial detainee's "due process rights to medical care 'are at least as great as the Eighth Amendment protections available to a convicted prisoner.'" *Id.* (quoting *Griffith v. Franklin Cnty.*, 975 F.3d 554, 566 (6th Cir. 2020)).

An Eighth Amendment deliberate indifference claim against a prison official has objective and subjective components. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Blackmore*, 390 F.3d at 895. The objective component requires a plaintiff to show the existence of a "sufficiently serious" medical need. *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "[A] medical need is objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Richmond v. Huq*, 885 F.3d 928, 938 (6th Cir. 2018) (quoting *Blackmore*, 390 F.3d at 897). The subjective component requires a plaintiff to show that the actor had "a sufficiently culpable state of mind in denying medical care." *Blackmore*, 390 F.3d at 895 (quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)). This showing "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Blackmore*, 390 F.3d at 896 (quoting *Horn v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)).

"Until recently, [the Sixth Circuit] 'analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims "under the same rubric."'" *Greene*, 22 F.4th at 605 (quoting *Brawner v. Scott Cnty.*, 14 F.4th 585, 597 (6th Cir. 2021)). While the objective prong of the Eighth Amendment analysis still applies to Fourteenth Amendment pretrial detainee claims, the Sixth Circuit modified the subjective prong for Fourteenth Amendment claims in *Brawner v. Scott County* in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). *Brawner*, 14 F.4th at 594–97. In *Kingsley*, the Supreme Court considered whether a pretrial detainee alleging excessive force in violation of the Fourteenth Amendment "must show that the officers were subjectively aware that their use of force was unreasonable, or only that the officers' use of that force was objectively unreasonable." 576 U.S. at 391–92. The Supreme Court held that the objective "standard is the correct one." *Id.* at 392. "In reaching that answer, the Court focused in part on the differences between the [Fourteenth Amendment's] Due Process Clause and the [Eighth Amendment's] Cruel and Unusual Punishments Clause." *Greene*, 22 F.4th at 606. The Supreme Court recognized that "[t]he language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all[.]" *Kingsley*, 576 U.S. at 400. "However, *Kingsley* did not address whether an objective standard applies in other Fourteenth Amendment pretrial-detainment contexts." *Brawner*, 14 F.4th at 592.

In *Brawner*, the Sixth Circuit joined the Second, Seventh, and Ninth Circuits in "conclud[ing] that *Kingsley*'s reasoning required 'modification of the subjective prong of the deliberate-indifference test for pretrial detainees.'" *Greene*, 22 F.4th at 606 (quoting *Brawner*, 14 F.4th at 596). The Court held that a pretrial detainee alleging deliberate indifference to his or her serious medical needs "must prove 'more than negligence but less than subjective intent—

something akin to reckless disregard.'" *Brawner*, 14 F.4th at 596 (quoting *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc)). "In other words, a plaintiff must prove that the defendant acted 'deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Greene*, 22 F.4th at 606 (alteration in original) (quoting *Brawner*, 14 F.4th at 597). Therefore, *Brawner*'s holding "reduced *Farmer*'s subjective element from 'actual knowledge to recklessness.'" *Lawler ex rel. Lawler v. Hardeman Cnty.*, 93 F.4th 919, 927 (6th Cir. 2024) (quoting *Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 316 (6th Cir. 2023)).

Conrad asserts qualified immunity as an affirmative defense to Montgomery's § 1983 claim against him. (Doc. No. 153.) The qualified immunity doctrine shields government officials performing discretionary functions from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013). It is intended to "'balance[ ] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Richko v. Wayne Cnty.*, 819 F.3d 907, 914 (6th Cir. 2016) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "[A] defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011) (citing *Pearson*, 555 U.S. at 232). Even if a plaintiff can show a genuine question of material fact as to whether a defendant violated his constitutional rights, the defendant is still entitled to qualified immunity if those rights were not clearly established at the time of violation.

A constitutional right is clearly established where existing precedent has placed the constitutionality of the challenged conduct "beyond debate," such that "every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). When a defendant invokes qualified immunity and carries his or her initial summary judgment burden, "the plaintiff bears the burden to show that qualified immunity is inappropriate." *Quigley*, 707 F.3d at 681. The Sixth Circuit recently held that a pretrial detainee's right to be free from reckless—not knowing—disregard to a serious risk of harm was not clearly established until, at the earliest, *Brawner*'s publication on September 21, 2021. *Lawler*, 93 F.4th at 927. When the date of the conduct at issue predates *Brawner*, "older decisions applying *Farmer* to the claims of pretrial detainees provide the only clearly established law." *Id.* at 927–28. Because Montgomery's allegations predate publication of the *Brawner's* decision, the Court applies the *Farmer* standard to the subjective prong of Montgomery's Fourteenth Amendment claims. *Id.*

### 1.      Deliberate Indifference to Serious Medical Needs

Conrad argues that Montgomery cannot satisfy the objective or subjective components of his Fourteenth Amendment deliberate indifference claim because Montgomery cannot establish that being a diabetic with ingrown toenails constitutes a sufficiently serious medical need or that Conrad knew of and disregarded a substantial risk of harm to Montgomery. (Doc. No. 153.) Montgomery argues that "the combination of being diabetic" and "the associated bleeding each ingrown extraction causes" constitutes a serious medical need and that Conrad knew that Montgomery was in pain but effectively denied Montgomery the ability to alleviate the pain by requiring that Montgomery's hands be restrained with a belly chain when clipping his nails. (Doc. No. 168, PageID# 1317.)

### a.    Objective Component

Courts have found that ingrown toenails, even those that may become infected, do not constitute a "serious medical need" sufficient to support the objective component of a deliberate indifference claim. *See Patterson v. Kim*, No. 1:08-CV-873, 2009 WL 2982753 (W.D. Mich. Sept. 14, 2009); *Tucker v. Rudd*, No. 3:17-cv-00673, 2017 WL 1353420 (M.D. Tenn. Apr. 13, 2017) (citing *Edwards v. Hynes*, CV316-019, 2016 WL 5844479, at *3 (S.D. Ga. Sept. 30, 2016), for the proposition that ingrown toenails is not a serious medical need when it caused plaintiff itching, pain, and a callous between toes but can progress to a serious infection); *see Boardley v. First Corr. Med.*, No. Civ.A.03–343, 2004 WL 2980727, *2 (D. Del. Dec. 21, 2004) (plaintiff's assertions regarding delay in treating ingrown toenails fails to state § 1983 claim because there was no serious medical need); *Langford v. Prima*, Case No. 17-CV-11862, 2018 WL 659247, at *4 (E.D. Mich. Feb. 1, 2018) (finding that plaintiff failed to allege that his ingrown toenail was a serious medical need under het objective component of a deliberate indifference claim).

This Court's decision in *Tucker* is instructive. There, a diabetic inmate alleged that his toenail was "ingrown" and "hurting" but he had to wait more than a week to use nail clippers. *Tucker*, 2017 WL 1353420, at *2. The inmate alleged that his toe became "a little infected" thereafter and he underwent two procedures for treatment. *Id.* The Court found that the ingrown toenail "did not present a serious medical need until [the toe] became infected" and "[n]either the slight delays nor the attempts at more conversative treatment before [p]laintiff was taken to a specialist constitute such woefully inadequate care as to amount to none at all." *Id.* at *3. The Court therefore dismissed the plaintiff's claim for failure to state a claim on which relief can be granted. *Id.*

Conrad has provided two "Comprehensive Diabetes Foot Examination Form[s]" that were completed for Montgomery on April 8, 2019, and July 16, 2019. (Doc. No. 152-1, PageID# 767,

768.) Both forms show that Montgomery has Type 2 diabetes, is under a dietary treatment to manage his disease, and is not prescribed any oral medication or insulin. (Doc. No. 152-1.) Montgomery's medical history documents show that he does not suffer from peripheral neuropathy, retinopathy, cardiovascular disease, peripheral vascular disease, or neuropathy. (Doc. No. 152-1, PageID# 767, 768.) The examiners indicated no change in Montgomery feet since the last evaluation and no "[c]urrent ulcer or history of a foot ulcer[.]" (*Id.*) Both forms show that Montgomery was categorized as a "[l]ow-[r]isk [p]atient" with intact protective sensation, no prior foot ulcer, no severe deformity, no amputation, and full pedal pulses present. (Doc. No. 152-1, PageID# 767, 768.)

Montgomery concedes that "ingrown nails alone perhaps [are] not a serious need," but argues that "the combination of being diabetic and all the serious foot concerns[,] includ[ing] the toenail that was causing pain [and was] inflamed, and the associated bleeding on each ingrown extraction[,]" makes matters "more complicated." (Doc. No. 168, PageID# 1317.) Montgomery asserts that, "although [he] didn't have calluses, fissures, ulcers, redness[,] or swelling at the time, he [did] have neuropathy and has taken gabapentin [medication] for it." (*Id.*) While Montgomery "agrees for purposes of summary judgment" that he was a low-risk patient, he asserts that the comprehensive diabetes exams "are to check for items mentioned, any nerve damage[,] and ability to feel stimuli" but not for the "purpose of ingrown nails or associated pain[.]" (Doc. No. 168, PageID# 1313.) Montgomery has not provided any support for these statements.[4]

Rule 56(c) requires that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by" "citing to particular parts of materials in the record, including

---

[4]     Montgomery provides a cite to a document bearing Bates number WELLPATH002021, but has not filed any corresponding document.

depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Montgomery has not done so, and his conclusory, unsworn, and unsupported statements are insufficient to create a genuine dispute of material fact that he suffered a sufficiently serious medical need in light of the record evidence Conrad provides.

Because Conrad has demonstrated the absence of a genuine issue of material fact as to the objective component of Montgomery's claim, Conrad is entitled to summary judgment. Because the Court finds that there is no constitutional violation, Conrad is entitled to qualified immunity from Montgomery's claims against him. *Bishop*, 636 F.3d at 765. The Court will address the subjective component of the claim in the interest of completeness.

### b.     Subjective Component

Montgomery claims that Conrad violated his constitutional rights by (1) requiring that Montgomery's hands be connected to a belly chain while Montgomery cut his own nails and (2) causing delays in Montgomery receiving nail trimming services by issuing orders not to allow nurses assigned to nail cutting duty into the building where Montgomery was housed. (Doc. No. 78.) Conrad argues that there was a legitimate penological basis for requiring the belly chain restraint because Montgomery was in restrictive housing under administrative or disciplinary status; that that he was not told by the medical staff that restraining a diabetic inmate for nail trimming created an unjustifiable risk of harm; and that he did not cause any delays in Montgomery trimming his nails. (Doc. No. 168.)

Courts in this circuit have held that body restraints were penologically justified when an inmate's behavior was disruptive or posed a threat to others. *Harris v. Ohio Dep't of Rehabilitation/Corr.*, No. 91-3920, 1992 WL 56999, at *2 (6th Cir. Mar. 24, 1992) (finding it penologically justified to require inmates to wear belt restraint during visits with friends and

family); *Syncate-El v. Toombs*, No. 92-1421, 1992 WL 301270, at *2 (6th Cir. Oct. 21, 1992) (finding inmate's history of assaultive and aggressive behavior and threat of future assaultive behavior justified restraints).

Conrad provides Montgomery's classification history and housing history showing that Montgomery was housed in a restrictive housing unit under administrative segregation, special needs, or disciplinary status between January and September 2019. (Doc. Nos. 152-8, 152-9.) DCSO classification director Beth Gentry states by affidavit that "inmates whose presence in the general jail population poses a serious threat to life, property, or the security and/or orderly operation of the correctional facility are placed in the RHU under Administrative Status, and inmates who commit rule violations are placed in the RHU under Disciplinary Status." (Doc. No. 152-6, PageID# 783, ¶ 5.) Conrad has filed two DCSO policies regarding the use of restraints on inmates who are placed in restrictive housing. DCSO Standard Operating Procedure 16-2.134, governs out-of-cell time for inmates housed in restrictive housing and provides that "[a]ll [o]ffenders[ ] will be in full restraints while out of their cells" with "[b]elly chain and leg irons . . . ." (Doc. No. 152-4, PageID# 779.) DCSO Restrictive Housing Policy 1-3.400 states that "restrictive housing inmates on administrative, pre-hearing, or disciplinary status [must] wear, at a minimum, handcuffs[ ] and leg restraints" when they are outside of their cells and that "a facility administrator or chief of security may authorize full restraints (belly chains, handcuffs, and leg irons) based on a history of assaultive or disruptive behavior." (Doc. No. 152-7, PageID# 790.) Montgomery's housing history shows that he was "being disruptive" and was placed in the RHU on administrative segregation "after [a] disciplinary sanction." (Doc. No. 152-9.) Conrad states that "RHU inmates scheduled for nail clipping services are placed in full restraints by correctional officers and escorted to a secure area outside of the housing pod, such as an atrium or program

room, where they are provided with nail clippers by medical staff." (Doc. No. 152-3, PageID# 777, ¶ 10; Doc. No. 154, PageID# 827, ¶ 4.)

Construing the record evidence in the light most favorable to Montgomery, the Court finds that Conrad has carried his initial burden to show the absence of a genuine dispute of material fact that Mathews knew of and disregarded a substantial risk of serious harm to Montgomery by requiring him to be in restraints while clipping his nails. The burden therefore shifts to Montgomery to show more than "[t]he mere existence of a scintilla of evidence in support of" his position. *Anderson*, 477 U.S. at 252.

Montgomery does not dispute that he was placed in restrictive housing in April 2019, but argues that he should not have been fully restrained because he was under administrative status and not disciplinary status and the "rules" regarding the use of restraint for inmates under administrate status are not designed to "punish[ ]." (Doc. No. 168, PageID# 1317.) Montgomery argues that he "did not have a history" of assaultive or disruptive behavior and therefore DCSO Restrictive Housing Policy 1-3.400 should not apply to him. (Doc. No. 168, PageID# 1318.) Montgomery also argues that the DCSO policies make it impossible for him to reach and cut his toenails, thereby depriving him of the nail care service he is entitled to and of his right to adequate medical care. (*Id.*) Montgomery also states that, in practice, inmates' "hands are freed to allow for them to functionally use the clippers" and "when [they are] finished, the inmates are reattached to the belly chain and returned to their cell." (Doc. No. 168, PageID# 1312.) Montgomery provides no record citations and has not filed any evidence that can be considered at summary judgment to support his assertions. Montgomery's unsupported statements are not sufficient to create a genuine dispute of material fact that Conrad acted with the requisite subjective intent to violate

Montgomery's Fourteenth Amendment protections in requiring him to be restrained when clipping his nails.

As to Montgomery's claim that Conrad delayed nail trimming, Conrad has presented sworn evidence that he was employed as a "[l]ieutenant with [ ] DCSO" in 2019 and that "DCSO employees are not made aware of when or how frequently an inmate submits nail clipping request." (Doc. No. 152-3, PageID# 776, 777, ¶¶ 3, 8.) Conrad states that "[m]edical staff, including those assigned to nail clipping, have an office in the Maximum Correctional Complex[,]" and that Conrad "do[es] not control whether medical staff have access to the building, and at no time did [he] issue any orders to DCSO employees or medical staff to not allow nurses into the building." (Doc. No. 152-3, PageID# 777, ¶ 12; Doc. No. 154, PageID# 827, ¶ 6.) Conrad also states that any delay in nail clipping services "may be . . . due to safety and security concerns" such as "staffing issues or other circumstances beyond DCSO's control [that] render correctional officers unavailable to retrieve, restrain, or escort inmates to the secure area outside of the housing pod for nail clipping[.]" (Doc. No. 152-3, PageID# 777, ¶ 11; Doc. No. 154, PageID# 827–28, ¶ 7.) Conrad also offers evidence that, during the relevant time period of June to July 2019, Montgomery submitted only two nail trimming requests on June 10 and July 12 that were fulfilled on June 13 and August 7, contradicting Montgomery's allegation that he "put in at least 4 nail cutting requests over the last 6–7 weeks for service without a response." (Doc. No. 152-10; Doc. No. 78, PageID# 385, ¶ 30; Doc. No. 154.)

Construing the record evidence in the light most favorable to Montgomery, Conrad has carried his initial burden to show the absence of a genuine dispute of material fact that he did not know of and disregard a substantial risk of serious harm to Montgomery. The burden therefore

shifts to Montgomery to show more than "[t]he mere existence of a scintilla of evidence in support of" his position. *Anderson*, 477 U.S. at 252.

In response, Montgomery disputes that "Conrad does not control whether medical staff have access to the Maximum Correctional Complex" and that "Conrad [did not] issue any orders to DCSO employees or medical staff to not allow nurses into the building." (Doc. No. 153, PageID# 827, ¶ 6.) Montgomery alleges that "it[']s ridiculous to say that the head person running the facility does not control who comes and goes in the building or doesn't know or approve[ ] everything that happens there" and that "two different nurses told [Montgomery] [that] he could not have his hands free[d] that day because Conrad, the person in charge, order[ed] it." (Doc. No. 168, PageID# 1312.) Montgomery further alleges that, "unsolicited [by Montgomery,] [these nurses] revealed that Conrad frequently orders DCSO staff not to allow nail cutting staff into the building." (*Id.*) Again, Montgomery has not pointed to any record evidence, aside from his own unsworn statements, to support his argument that Conrad caused any delay in Montgomery receiving nail trimming services. Montgomery's unsupported statements are not sufficient to create a genuine dispute of material fact that Conrad knew of and disregarded a substantial risk of harm to Montgomery. *See* Fed. R. Civ. P. 56(c).

Conrad is therefore entitled to qualified immunity from Montgomery's § 1983 claim at summary judgment.

### D.     The Wellpath and Metro Defendants' Motion for Summary Judgment

Montgomery asserts claims for deliberate indifference to his serious medical needs against Wellpath, Lewis, and Jaynes for denial of a prophylactic dental cleaning and a crown to fix a broken tooth and, following the June 3, 2019 dental examination, denial of treatment for bleeding gums and denial of dental floss and tooth picks; against Dame, Wall, and Bailey for failure to provide timely treatment and medication for chronic back pain; against Wellpath and Bailey for

prescribing too many NSAID medications, and against Wellpath Conrad, and West for denial of treatment for ingrown toenails. (Doc. No. 78.) The Wellpath and Metro Defendants argue that they are entitled to summary judgment because they were not deliberately indifferent to Montgomery's serious medical needs. (Doc. No. 158.)

### a. Montgomery's Requests for Dental Care

Wellpath, Jaynes, and Lewis argue that Montgomery cannot meet the objective component of a deliberate indifference claim regarding his requests for a prophylactic dental cleaning and a crown to fix his broken tooth and that the Court should grant summary judgment for the same reasons it granted Metro's motion to dismiss on these claims. (Doc. No. 158.) The Court addressed these claims in its initial screening of Montgomery's complaint as follows:

> [T]he alleged need for prophylactic teeth cleaning and a crown to treat one tooth's sensitivity to cold and heat is not sufficiently serious to allow the inference that denial of those services posed a substantial risk of serious harm. [Montgomery] does not allege . . . that he suffered any tooth decay or pain as a result of the denial of a professional cleaning. Regarding the alleged need for a crown to remedy sensitivity in his tooth, [Montgomery] states that this sensitivity merely produced discomfort which was tolerable enough that he did not request dental services after a crown was first denied in 2017. In the absence of allegations demonstrating his objectively serious need for treatment, [Montgomery's] claim that it was unconstitutional to provide "just cursory examinations or extractions" and his request that the Jail be enjoined to "institute a plan where every inmate held over one year get[s] a minimum of teeth cleaning" must fail.

(Doc. No. 127, PageID# 660 (citing Doc. No. 9, PageID# 42–43 (citations omitted).)

On Metro's motion to dismiss Montgomery's second amended complaint, the Court found:

> As Metro asserts in its motion to dismiss, Montgomery's second amended complaint repeats his allegations that Jail staff did not provide prophylactic cleaning services and denied his request for a crown, but "does not contain any allegations of pain or difficulty eating or sleeping due to his tooth's sensitivity that would indicate that this discomfort was no longer tolerable" or otherwise indicate "any objectively serious need for treatment." (Doc. No. 83, PageID# 412 n.3.) Instead, Montgomery asserts that he "continue[d] to tolerate the sensitivity discomfort" after his requests for cleaning and a crown were denied. (Doc. No. 78, PageID# 380, ¶ 17.) These allegations are insufficient to satisfy the objective prong of Montgomery's deliberate indifference claim. *See Wishneski v. Doña Ana Cnty.*,

No. CV 08-0348, 2009 WL 10708582, at *4 (D.N.M. Feb. 19, 2009), *report & recommendation adopted as modified*, 2009 WL 10708217 (D.N.M. May 7, 2009) ("Wishneski does not have a constitutional right to prophylactic [dental] care . . . and neither Wishneski's complaint nor his subsequent filings indicate that he was harmed by the Detention Center's alleged policy of treating cavities by extraction only. The record does not reflect that Wishneski had any teeth pulled as a result of the policy or that he was otherwise adversely affected by it."). Because Montgomery has not plausibly alleged that the failure to provide dental cleanings or a crown violated his rights, Metro's motion to dismiss should be granted with respect to these allegations.

(*Id.* at PageID# 660–61 (alteration in original).)

Wellpath, Jaynes, and Lewis thus properly assert that the Court has already found Montgomery's allegations insufficient to support the objective prong of a Fourteenth Amendment deliberate indifference claim. In response, Montgomery generally repeats his allegation that "[he] was denied treatment for [a] broken tooth or a cleaning, [and that] he advised [that] he didn't want [to] come [for another dental examination] unless they would actual[ly] give service." (Doc. No. 166, PageID# 1298.) Because the Court has already found that these facts, construed in the light most favorable to Montgomery, do not satisfy the objective prong of the Fourteenth Amendment analysis—and because Montgomery has not offered any other argument or evidence to change that conclusion at summary judgment—Wellpath, Jaynes, and Lewis are entitled to judgment as a matter of law on Montgomery's claim regarding denial of prophylactic dental care and a crown.

### b. Montgomery's Dental Treatment After June 3, 2019

Montgomery claims that, during his June 3, 2019 dental examination, Lewis and Jaynes were deliberately indifferent to his serious medical needs when they denied his requests for a dental cleaning to treat the gaps between his teeth, bleeding in his gums, and excessive calcified tartar build up, and a crown to fix a broken tooth and alleviate temperature sensitivity. (Doc. No. 78.) Montgomery further claims that he was not provided dental floss or toothpicks to perform his own

28

dental care. (*Id.*) Lewis and Jaynes argue that they are entitled to summary judgment because they "did not exhibit deliberate indifference to [Montgomery's] allegedly serious medical need" and that the medical records "show that [Montgomery] received professional dental examinations and was offered debridement for his gingivitis issues." (Doc. No. 158, PageID# 856.)

Lewis and Jaynes have filed dental progress notes showing Montgomery's history of dental care while in custody. (Doc. No. 159-1.) These reports show that Montgomery was examined on June 21, 2017, and that Lewis and Jaynes noted that he had mild gingivitis, "multiple decayed teeth[,]" and "fair" oral hygiene. (Doc. No. 159-1, PageID# 1141.) Lewis and Jaynes informed Montgomery of their findings and that "treatment of chronic symptoms [is] not available at this facility" and "advise[d] [Montgomery] to place sick call if [his] teeth became symptomatic" and to request a comprehensive dental exam when he was transferred out of DCSO custody. (*Id.* at PageID# 1142.) Lewis and Jaynes scheduled Montgomery for annual oral exam in March 2018, but Montgomery "refused" to attend that appointment. (*Id.* at PageID# 1140.)

A dental progress note shows that Montgomery was examined on June 3, 2019. (Doc. No. 159-1, PageID# 1137.) Lewis's findings show that Montgomery had "multiple missing and decayed teeth[,]" his gingivitis had worsened from mild to "severe[,]" and his oral hygiene was now deemed "poor[.]" (*Id.* at PageID# 1138.) Montgomery was informed of Lewis's findings and again advised that "treatment of chronic symptoms was not available at this facility," that he should "place [a] sick call if tooth or teeth [became] symptomatic, and that he should seek a comprehensive exam when transferred from DCSO custody. (*Id.*) Lewis scheduled Montgomery for another annual oral exam. (*Id.*) On July 26, 2019, Lewis noted that Montgomery "present[ed] for general debridement" and that that there was "[p]rofuse bleeding upon touch." (*Id.* at PageID# 1136.) Lewis performed general debridement of Montgomery's teeth, including in his

"[m]axillary arch left and right quadrants[,]" "[g]ross plaque and calculus [were] removed with hand scalers[,]" and his maxillary arch was "[f]lossed." (*Id.*) Lewis concluded that Montgomery "will be rescheduled for general debridement of lower tight" at a later time. (*Id.*) A dental progress note shows that Montgomery "refused [to attend his] scheduled dental appointment for debridement" on October 17, 2019. (*Id.* at PageID# 1135.) On the same day, Montgomery reported a "[s]harp" "[t]hrobbing" "[i]ntermittent" tooth pain and sensitivity to heat and cold. (Id. at PageID# 1219.) The progress note states that the pain is "related to teeth and that there is no inflammation or other complicating factor." (*Id.* at PageID# 1221.) On October 23, 2019, Lewis again performed "general debridement" of Montgomery's teeth and scheduled him for an annual exam. (*Id.* at PageID# 1134.)

Construing the record in the light most favorable to Montgomery, Lewis and Jaynes have carried their initial burden to show the absence of a genuine dispute of material fact that they did not deny Montgomery adequate dental care after June 3, 2019. The burden therefore shifts to Montgomery to show more than "[t]he mere existence of a scintilla of evidence in support of" his position. *Anderson*, 477 U.S. at 252.

Montgomery argues that he did not receive an oral examination within ten days of his arrival at the jail as required by Wellpath policy OPS-300_E-06, that his first oral examination took place "eleven months after his arrival[,]" and that the exam was a "cursory visual inspection of [his] teeth." (Doc. No. 166, PageID# 1298.) Montgomery generally does not dispute the dental history provided by Lewis and Jaynes, but complains about the treatment course that Lewis provided. (Doc. No. 166.) Montgomery disputes the assertion that he was advised to place a sick call if his teeth became symptomatic because "it was already symptomatic as [he] was experiencing sensitivity pain to hot and cold temperatures." (*Id*. at PageID# 1290.) Montgomery also states that

"debridement was offered only after [he] sent notice of suit to DCSO and Wellpath and after [he] [filed] his suit." (*Id.*) As to the assertion that that he refused dental treatment on two occasions, Montgomery states there is "no signed refusal record" and that it is "just non-sense" because "[he] [wouldn't] complain of tooth pain from sensitivity and then refuse dental treatment." (*Id.*) Montgomery does not dispute the assertion that Lewis performed general debridement on October 23, 2019, but characterizes the treatment as a "partial cleaning[.]" (*Id.*)

Montgomery's unsupported statements are not sufficient to create a genuine dispute of material fact that Lewis and Jaynes knew of and disregarded a substantial risk of harm to his medical needs. *See* Fed. R. Civ. P. 56(c). Rather, the record shows that Montgomery received regular dental care when requested and declined offered care on two occasions. Montgomery's argument that he declined dental care because he disagreed with the course of treatment is insufficient to support a deliberate indifference claim. *See Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017) (holding that a "desire for additional or different treatment does not by itself suffice to support an Eighth Amendment claim") (citing *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014); then citing *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). Accordingly, Lewis and Jaynes are entitled to summary judgment on Montgomery's claim regarding the adequacy of his dental care after June 3, 2019.

### c. Nail Clipping

Montgomery alleges that Dame and West were deliberately indifferent to his serious medical needs when he was unable to cut his ingrown toenails because his hands were connected to a belly chain, West refused to cut Montgomery's toenails for him, and Dame and West advised Montgomery that Conrad caused the delays in providing nail services. (Doc. No. 78.) Dame and West argue that they are entitled to summary judgment because Montgomery's ingrown toenails

31

are not a sufficiently serious medical need to satisfy the objective component of a deliberate indifference claim. (Doc. No. 158.)

The Court has already found that uninfected ingrown toenails that are not causing other serious medical conditions do not constitute a sufficiently serious medical need to establish the objective prong of a Fourteenth Amendment claim. *See Patterson*, 2009 WL 2982753; *Tucker,* 2017 WL 1353420; *Langford v. Prima*, 2018 WL 659247, at *4. For these reasons, Dame and West are entitled to summary judgment on this claim against them.

### d. Back Pain

#### i. Bailey

Montgomery states that, on or about June 18, 2019, Bailey prescribed the muscle relaxant Flexeril to treat his back pain, but "assigned nurses" did not deliver the medicine to him for another two days and that he received only five of the ten doses prescribed. (Doc. No. 78, PageID# 382, ¶ 22.) Montgomery states that the Flexeril prescription then expired and that he had to wait nearly two weeks to get a refill. (Doc. No. 78.) Montgomery also claims that Wellpath and Bailey issued him too many NSAID medications for his pain, which caused him to suffer internal bleeding and collapse. (*Id.* at PageID# 385, ¶ 31.) He alleges that he was diagnosed with "a hole in his stomach area" and received "several endoscopy surgeries to stop the bleeding." (*Id.*)

Bailey has filed records showing that he first evaluated Montgomery for "chronic back pain" on February 16, 2018. (Doc. No. 159-1, PageID# 912.) Bailey subsequently evaluated Montgomery and scheduled follow-up appointments, placed new or refill prescription orders for "Tylenol[,]" "aspirin[,]" "Mobic[,]" and "Miralax[,]" or consulted with other nurses regarding Montgomery's back pain on at least seven occasions in 2019. (Doc. No. 159-1, PageID# 1164, 1166.) On June 17, 2019, Montgomery complained of "aching and sharp pain in his midback between the shoulder blades and back spams." (Doc. No. 160, PageID# 1262, 1263, ¶¶ 15, 20;

Doc. No. 159-1, PageID# 1165.) On that same day, Bailey examined Montgomery, Bailey prescribed him Flexeril to start immediately, and scheduled a follow-up visit in seven days. (Doc. Nos. 159-1, 160.) On June 22, 2019, Montgomery submitted a healthcare request stating that he "only received 5 of the 10 doses prescribed due to a delay in med[ications] arriving from the Pharmacy to get started and [his] [two] court appearances" and requested that his Flexeril medication be "extend[ed] . . . [for] a few more days [because] [his] back [is] still hurting." (Doc. No. 159-1, PageID# 1229.) Montgomery was "seen" at triage on June 24, 2019, by nurse Angela Haile and who "consulted . . . Bailey . . . [who] did not make any new order [because] [Montgomery] had a follow up appointment scheduled for his back on July 2, 2019" and because Montgomery was already prescribed Flexeril and Montgomery "[was] currently on Mobic 7.5 mg PO BID PRN and Tylenol 975 mg PO BID PRN." (Doc. No. 159-1, PageID# 1206, 1229; Doc. No. 160, PageID# 1263, ¶¶ 21, 22.) Montgomery "was upset with result but verbalized understanding and requested to have physical therapy or another [treatment] plan put into place because of the severity of pain [related to] muscle spams." (Doc. No. 159-1, PageID# 1207.) On June 27 and July 5, 2019, Bailey placed additional orders for "aspirin" and "Tylenol" for Montgomery to treat the chronic back pain. (Doc. No. 159-1, PageID# 1164; Doc. No. 160, PageID# 1264, ¶ 25.)

As to Montgomery's claim that Bailey prescribed too many NSAIDs that caused Montgomery to suffer internal bleeding on September 2, 2019, the record evidence shows that, from July 2019 to September 2019, Montgomery requested more medications for his chronic back pain and several nurses other than Bailey prescribed him Flexeril and Mobic. (Doc. No. 160.) Bailey asserts that Montgomery reported pain in his shoulder and upper arm and Bailey "ordered an x-ray of his left shoulder" and prescribed prednisone. (Doc. No. 160, PageID# 1265, ¶ 28.) On

August 22 and 28, 2019, Montgomery reported back pain and associated stomach pain, stating that "Tylenol and Mobic [did] not help" and requested "more Flexeril or something better"; after Brown "check[ed] Montgomery's chart and [spoke] with . . . Bailey[,]" "no flexeril was ordered at this time" for Montgomery. (first quoting Doc. No. 159-1, PageID# 1225–26; then quoting *id.* at PageID# 1184.) On September 2, 2019, Montgomery made a request for Flexeril or physical therapy because medical staff "refuse to give [him] medicine for back spams"; Montgomery was seen at triage two days later; and Nurse Cullen ordered an x-ray of his thoracic spine, prescribed Flexeril, and scheduled him for a follow-up appointment on September 9, 2019. (*Id.* at PageID# 1182, 1224).

Construing the record in the light most favorable to Montgomery, the Court finds that Bailey has carried his initial burden to show the absence of a genuine dispute of material fact that there was not a significant delay in Montgomery receiving his Flexeril prescription and that Bailey frequently provided adequate care to Montgomery for back pain; that Bailey promptly saw Montgomery for back pain and prescribed him medication in June 2019; and that Bailey, after reviewing Montgomery's medical chart showing the medications he was currently taking, stopped prescribing additional pain medications. The burden therefore shifts to Montgomery to show more than "[t]he mere existence of a scintilla of evidence in support of" his position. *Anderson*, 477 U.S. at 252.

Montgomery does not dispute the asserted fact that, on June 17 and 27, 2019, Bailey evaluated him and prescribed medication for his back pain. (Doc. No. 166.) Montgomery acknowledges that Bailey prescribed him NSAIDs but that "several other Wellpath doctors" and "nurses" "followed suit doubling down on the [NSAIDs] until [he] finally collapsed." (Doc. No. 166, PageID# 1300.) Montgomery generally argues that he "detrimentally relied on the skill

and training of medical professionals to provide the care needed to resolve [his] medical crisis" and that the "Wellpath staff, beginning with . . . Bailey, ultimately failed [Montgomery] leading him to a collapse in his cell, internal bleeding[,] and a 17-day hospital stay." (Doc. No. 166, PageID# 1299–1300.) But Montgomery has not pointed to any record evidence, aside from his own unsworn statements, to support his argument that Bailey denied him medical treatment for his back pain, that Bailey was responsible for Montgomery being prescribed too many NSAIDs, or that taking too many NSAIDs caused his internal bleeding. Montgomery's unsupported statements are not sufficient to create a genuine dispute of material fact that Bailey knew of and disregarded a substantial risk of harm to Montgomery. *See* Fed. R. Civ. P. 56(c).

Bailey is therefore entitled to summary judgment on Montgomery's claim against him.

### ii. Dame and Wall

Montgomery alleges that, in mid-April 2019, several nurses, including Dame and Wall, walked by his cell and saw him "doubled up on the floor" of his cell, and that he told them of the "severity" of his stomach and back pain that "was persisting day and night[.]" (Doc. No. 78, PageID# 381, ¶ 21.) Montgomery alleges that the nurses ignored his plea for "immediate help" and told him to place a "sick call." (*Id.* at PageID# 381–82, ¶ 21.) Montgomery further alleges that Wall deprived him of needed pain medication when, on one occasion, Montgomery asked Wall for his pain medication but Wall told him that Wall could not "'go get that for you, you're not the only person here I have to take care of.'" (*Id.* PageID# 383, ¶ 25.)

Dame and Wall assert that "[t]he medical records do not reflect [Montgomery] made a sick call regarding stomach or back pain complaints in April 2019." (Doc. No. 160, PageID# 1261, ¶ 14.) The medical records show that Montgomery submitted a healthcare request form on April 26, 2019, complaining that his "foot cream was stolen by a guard" and requesting to have it replaced but did not complain of stomach or back pain. (Doc. No. 159-1, PageID# 1233.)

35

Montgomery's other medical records for that month do not show that Montgomery complained of stomach or back pain. A "Periodic Health Assessment" form dated April 11, 2019, shows that Montgomery had a physical exam and his abdomen and musculoskeletal were marked "normal[,]" and Montgomery answered "no" to whether he had "any health changes since [his] last exam" (*id.* at PageID# 1145, 1146); and Montgomery signed two "Refusal of Treatment" forms on April 13 and 16, 2019, showing that Montgomery 'refused [his] [Gemfibrozil] med[ications] and was explained the potential consequences for refusing treatment, including "[w]orsening [o]f [m]edical [c]onditions[,]" [p]ermanent disability[,]" and "[d]eath" (*Id.* at PageID# 1130–31). Montgomery's examinations in late April 2019, also show that he did not voice any complaints of stomach or back pain. (Doc. No. 159-1.)

Construing the record in the light most favorable to Montgomery, the Court finds that Dame and Wall have carried their initial burden to show the absence of a genuine dispute of material fact that Montgomery placed sick call request regarding his stomach and back pain and that Dame and Wall knew of and disregarded a substantial risk of harm to Montgomery. The burden therefore shifts to Montgomery to show more than "[t]he mere existence of a scintilla of evidence in support of" his position. *Anderson*, 477 U.S. at 252.

In his response, Montgomery disputes Dame and Wall's assertion that he did not make a sick call request in April 2019, stating that "[n]ot only did [he] make sick call requests in writing, he made complaints directly to nurses as they passed by the cell [and] they provided no help except to say put in another sick call, but they never brought [him] a sick call." (Doc. No. 166, PageID# 1292.) Montgomery asserts the additional fact, repeating the allegations from his complaint, that "at one point [he] was doubled up on the floor with several nurses passing by the cell but offering no help" and he "was in obvious pain which the nurses were completely indifferent

to." (*Id.*) But Montgomery has not supplied any record evidence to support his allegations. See Fed. R. Civ. P. 56(c); *see also Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986) ("The nonmoving party is not entitled to a trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint.") (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289–90 (1968)). Dame and Wall are therefore entitled to summary judgment on Montgomery's claim.

### 2. Montgomery's Requests for Better Mattress and Extra Blanket

Wellpath argues that Montgomery's requests for a better mattress and extra blanket fail as a matter of law because they do not constitute a deliberate indifference to Montgomery's conditions of confinement or serious medical needs. (Doc. No. 158.) Wellpath argues that the Court dismissed this claim against Metro on the same basis at the pleading stage and therefore should be dismissed against it at summary judgment. (*Id.*)

In its report and recommendation, the Court granted Metro's motion to dismiss Montgomery's claim that medical and jail staff failed to provide a better mattress and extra blanket under a deliberate indifference condition-of-confinement and serious medical needs analysis. (Doc. No. 127.) In the context of a condition-of-confinement claim, the Court found that. in "'the absence of evidence that a prisoner suffered a physical injury, the deprivation of a mattress and bedding for a fixed period of time does not violate the Eight Amendment.'" (*Id.* at PageID# 666 (quoting *Richmond v. Settles*, 450 F. App'x 448, 455 (6th Cir. 2011); then citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).). Specifically, the Court explained that:

> Although Montgomery alleges that he requested "a better quality mattress and extra blanket to deal with" his "chronic back pain issues and to stay warm since he was assigned a corner cell[,]" (Doc. No. 78, PageID# 381, ¶ 20), he has not alleged that his cell was intolerably cold. *Cf. Wilson*, 501 U.S. at 304. And, while Montgomery has alleged that his back pain worsened after his request for a better mattress was denied, that fact alone does not elevate the denial of his request for a better mattress to the level of a constitutional violation. *See Ross v. Davidson Cnty. Sheriff's Off.*,

No. 3:19-cv-00726, 2019 WL 4573507, at *2, 5 (M.D. Tenn. Sept. 20, 2019) (finding that pretrial detainee's allegations that he "experienc[ed] back pain, neck, and shoulder pain and [suspected] bed sores after jail officials denied his request for a better mattress "d[id] not rise to the level of a constitutional violation").

(*Id.*)

In the context of a deliberate indifference to serious medical needs claim analysis, the Court

found that:

> Montgomery alleges that his "chronic back pain issues" were "documented" (Doc. No. 78, PageID# 381, ¶ 20), but there is not sufficient factual information in the second amended complaint from which to infer that his condition had "'been diagnosed by a physician as mandating treatment'" or was "'so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Richmond v. Huq*, 885 F.3d at 938. Nor can the Court reasonably infer that the staff who denied Montgomery's requests "acted "'recklessly in the face of an unjustifiably high risk" that [was] either "known or so obvious that it should be known"' to a reasonable official in [their] position." *Hyman*, 27 F.4th at 1237; *see also Ross*, 2019 WL 4573507, at *5 (dismissing claims for denial of request for better mattress where "[p]laintiff ha[d] not named a defendant responsible for denying [p]laintiff's request for a thicker mattress who acted with deliberate indifference to [p]laintiff's serious medical needs").

(*Id.* at PageID# 667.)

Montgomery does not directly address Wellpath's argument for summary judgment on this claim and does not argue any distinctions of law or fact that would require the Court to reach a different conclusion regarding Wellpath's liability. (Doc. No. 166.) Instead, Montgomery generally repeats his allegations and argues that Wellpath's motion for summary judgment was written "in the form to support [a] motion to dismiss, [but] we are not here for that." (Doc. No. 166, PageID# 1301.) Because the Court has already found that Montgomery's factual allegations, construed in the light most favorable to Montgomery, do not constitute a deliberate indifference claim either under condition-of-confinement or serious medical needs analysis—and because Montgomery has not offered any other argument or evidence to change that conclusion—Wellpath

is entitled to summary judgment on Montgomery's claim regarding denial of a better mattress and extra blanket.

### 3.    Municipal Liability Claims Against Wellpath and Metro

Montgomery claims that Wellpath and Metro caused his injuries through the acts of their employees. (Doc. No. 78, PageID# 386–87, ¶ 35.) Wellpath and Metro argue that they are entitled to summary judgment because Montgomery cannot establish that Wellpath and Metro's policies or procedures caused the alleged constitutional violations and thus cannot establish municipal liability. (Doc. No. 158.)

A governmental entity or municipality is responsible under § 1983 only for its "own illegal acts. [It is] not vicariously liable under § 1983 for [its] employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal citations and quotation marks omitted); *see Thomas v. City of Chattanooga*, 398 F.3d 426, 432–33 (6th Cir. 2005) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)); *see Monell*, 436 U.S. at 694 (holding that a municipality "may not be sued under § 1983 for injury inflicted solely by its employees or agents"). Accordingly, a local government entity can only be held liable under § 1983 if the plaintiff demonstrates that the municipality itself is the wrongdoer and that the alleged federal violation was a direct result of a municipal policy or custom, such that the municipality's promulgation or adoption of the policy can be said to have caused one of its employees to violate the plaintiff's constitutional rights. *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell*, 436 U.S. at 693); *Regets v. City of Plymouth*, 568 F. App'x 380, 393–94 (6th Cir. 2014). In other words, the plaintiff must show that a policy or custom of the municipality was the "moving force" behind the alleged constitutional violations. *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010). A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: "'(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final

39

decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.'" *Wright v. City of Euclid*, 962 F.3d 852, 880 (6th Cir. 2020) (quoting *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019)). At bottom, the plaintiff must "'identify the policy, connect the policy to the city itself, and show that the particular injury was incurred because of the execution of that policy.'" *Wright*, 962 F.3d at 880 (quoting *Jackson*, 925 F.3d at 829).

Montgomery argues municipal liability against Wellpath and Metro based on the existence of an illegal official policy and the existence of a custom of tolerance of or acquiescence to civil rights violations.

### a. Unconstitutional Policy

A municipal policy may be unconstitutional in two ways: "(1) facially unconstitutional as written or articulated, or (2) facially constitutional[,] but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006)). "Where the identified policy is itself facially lawful, the plaintiff 'must demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice.'" *Id.* (quoting *Bd. Of Cnty. Commr's v. Brown*, 520 U.S. 397, 407 (1997)).

Wellpath argues that Jaynes, a "dental technician employed by [it][,] is not a final policymaker for purposes of setting forth 'policy' that could form the basis for municipal liability under Section 1983" and that Montgomery has not "provided any facts to suggest that such authority had been delegated to [ ] Jaynes." (Doc. No. 158, PageID# 868.) Wellpath and Metro argue that Montgomery has failed to point to any policy that are the cause of his injuries and that

40

even if such policy existed, such items are not provided to inmates because they are considered "contraband." (Doc. No. 158, PageID# 870 (citing Doc. No. 159-1, PageID# 1133 (Montgomery "was informed that floss is not provided to inmates at the Nashville Sherriff Office and is considered a contraband.")).) Wellpath and Metro further argue that a nurse who declined to cut an inmate's toenail "does not amount to a policy against nail cutting." (Doc. No. 158, PageID# 871–72.)

Montgomery has not responded to that argument and has not presented any record evidence to prove the existence of an unconstitutional policy by Wellpath and Metro. Wellpath and Metro are therefore entitled to summary judgment on Montgomery's unconstitutional policy theory. *See Gregory*, 444 F.3d at 752; *Mosier v. Evans*, Case No. 1:20-cv-02197, 2023 WL 2074320, at *10 (W.D. Tenn. Feb. 17, 2023), *appeal dismissed*, 2023 WL 4105377 (6th Cir. Mar. 23, 2023)

### b.    Pattern or Custom of Illegal Acts

Even where a municipality has not enacted an unconstitutional policy, a plaintiff can challenge its "custom" of illegal practices. *See Monell*, 436 U.S. at 692. To survive summary judgment under this theory, a plaintiff must show:

> (1) the existence of a clear and persistent pattern of [illegal activity]; (2) notice or constructive notice on the part of the [municipality]; (3) the [municipality's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the [municipality's] custom was the 'moving force' or direct causal link in the constitutional deprivation.

*Thomas*, 398 F.3d 426, 429 (6th Cir. 2005 (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996)). A custom-of-tolerance claim therefore "requires a showing that there was a pattern of inadequately investigating similar claims." *Burgess*, 735 F.3d at 478. "Failing to prove even one of those four elements causes a custom of tolerance claim to fail." *Stewart v. City of Memphis*, 788 F. App'x 341, 347 (6th Cir. 2019). A custom must be "'so permanent and well

41

settled as to constitute a custom or usage with the force of law'" and "the notion of 'law' must include '[d]eeply embedded traditional ways of carrying out state policy." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507–08 (6th Cir. 1996) (first quoting *Monell*, 436 U.S. at 691; then quoting *Nashville, Chattanooga & St. Louis Ry. Co. v. Browning*, 310 U.S. 362, 369 (1940)) (alteration in original). The custom "must reflect a course of action deliberately chosen from among various alternatives." *Doe*, 103 F.3d at 508.

Wellpath and Metro argue that Montgomery's custom-of-tolerance claim must fail because he has not "point[ed] to any examples of prior instances of unconstitutional conduct" by their staff or employees. (Doc. No. 158, PageID# 866.) Montgomery has not responded to this argument and has not pointed to record evidence demonstrating prior unconstitutional conduct by Wellpath and Metro employees that put Wellpath and Metro on notice. Sixth Circuit precedent "has made clear that one instance of . . . misconduct is not enough for a custom violation under *Monell*." *Cunningham v. Shelby Cnty.*, No. 2:18-cv-02185, 2024 WL 1155391, at *6 (W.D. Tenn. Feb. 6, 2024) (citing *Stewart*, 788 F. App'x at 347). Montgomery has therefore failed to point to "any evidence of a pattern" as required to create a genuine issue of material fact that Wellpath and Metro had a custom of tolerance. *Burgess*, 735 F.3d at 478; *see Stewart*, 788 F. App'x at 347–48 ("Because of the dearth of evidence, a reasonable jury could not conclude that the [municipality's] alleged failure to properly investigate the alleged [conduct] shows the existence of a clear and persistent pattern.")

### 4. Montgomery's ADA and Rehabilitation Act Claims

Wellpath and West argue that Montgomery cannot succeed on his claims under the ADA and Rehabilitation Act because Montgomery cannot establish that he has a disability or that he was excluded from participation in, denied benefits of, or subjected to discrimination under public policy because of his alleged disability. (Doc. No. 158.)

In order to prevail a claim under Title II of the ADA or § 504 of the Rehabilitation Act, a plaintiff must show "that he (1) is disabled under the statutes, (2) is 'otherwise qualified' for participation in [a state or local government] program, and (3) 'is being excluded from participation in, denied the benefits of, or subjected to discrimination 'because of his disability or handicap, and (4) (for the Rehabilitation Act) that the program receives federal financial assistance." *Hollis v. Howard*, No. 16-5115, 2016 WL 9804159, at *2 (6th Cir. Dec. 21, 2016) (alteration in original) (quoting *Gohl v. Livonia Pub. Sch. Dist.*, 836 F.3d 672, 682 (6th Cir. 2016)).

In dismissing these claims against Metro, the Court found that Montgomery "ha[d] not stated a claim on which relief can be granted under the ADA or Rehabilitation Act" because his "amended complaint does not contain sufficient facts for the Court to reasonably infer that he has been excluded from participation in, denied the benefits of, or subjected to discrimination under any public program because of his disability" and does not allege "any facts suggesting that [Montgomery] was denied access to [medical and dental care] because of his disability." (Doc. No. 127, PageID# 668, 669; Doc. No. 130.) The Court concluded that, "[b]ecause [Montgomery] ha[d] not alleged that he was subjected to any discriminatory treatment, Montgomery ha[d] not stated a claim under the ADA or Rehabilitation Act, and those claims should be dismissed." (*Id.* at PageID# 669.)

Montgomery has not offered any evidence or argument at summary judgment to overcome the deficiencies of his ADA and Rehabilitation Act claims as pleaded. Accordingly, Wellpath and West are entitled to summary judgment on Montgomery's ADA and Rehabilitation Act claims as a matter of law.

5. **Montgomery's State-Law Claims**

a. **Medical Negligence and Malpractice Claim**

Montgomery asserts claims for medical negligence and malpractice against Wellpath, Lewis, and Bailey. (Doc. No. 78.) Wellpath, Lewis, and Bailey argue that Montgomery's claims are subject to the Tennessee Health Care Liability Act (THCLA), Tenn. Code. Ann. §§ 29-26-101–122, and that the claims fail as a matter of law because Montgomery "failed to plead facts alleging the elements required for a THCLA claim." (Doc. No. 158, PageID# 876.)

The THCLA governs all health care liability actions—defined as "any civil action . . . alleging that a health care provider or providers have caused an injury related to the provision of, or failure to provide, health care services to a person, regardless of the theory of liability on which the action is based"—brought under Tennessee law. Tenn. Code Ann. § 29-26-101(a)(1). There is no dispute that Montgomery's malpractice claim falls within the THCLA's broad scope. *See Osunde v. Delta Med. Ctr.*, 505 S.W.3d 875, 884–85 (Tenn. Ct. App. 2016) ("Given the breadth of the statute, it should not be surprising if most claims now arising within a medical setting constitute health care liability actions." (footnote omitted)).

To prevail on a THCLA claim, a plaintiff must prove three elements:

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. §29-26-115(a). The Tennessee Supreme Court has held that, "[g]enerally, . . . [these elements] must be proven through the testimony of a qualified expert witness." *Young v.*

*Frist Cardiology, PLLC*, 599 S.W.3d 568, 571 (Tenn. 2020); *see also Est. of Barnwell v. Grigsby*, 801 F. App'x 354, 366 (6th Cir. 2020) ("[T]he plaintiff 'in most medical negligence cases must provide expert testimony to establish the required elements' of a THCLA claim.") (quoting *Shipley v. Williams*, 350 S.W.3d 527, 550 (Tenn. 2011)). "This is because 'most medical claims involve complicated and technical information which is beyond the general knowledge of a lay jury.'" *Est. of Barnwell*, 801 F. App'x at 366 (quoting *Seavers v. Methodist Med. Ctr. of Oak Ridge*, 9 S.W.3d 86, 92 (Tenn. 1999)). There are, however, exceptions to the general rule, and courts have found that not every claim brought under the THCLA requires expert proof. *See, e.g., Mullin v. Rolling Hills Hosp.*, No. 3:16-cv-02609, 2017 WL 6523482, at *6–7 (M.D. Tenn. Apr. 17, 2017) (discussing "common knowledge exception" to THCLA's expert proof requirement and finding expert proof was not required to establish plaintiffs' claims for abuse of process, false imprisonment, intentional and negligent infliction of emotional distress, conversion, assault, and breach of duty of care), *report and recommendation adopted by* 2017 WL 2953357 (M.D. Tenn. July 11, 2017).

Wellpath, Lewis, and Bailey argue that Montgomery has failed "to specify the duty that was owed to him . . . in order to establish the standard of acceptable professional practice"; failed "to articulate a breach of that duty because [Montgomery] does not allege that any individual Wellpath Defendants failed to comply with the applicable standard of care"; and failed to "allege that he suffered injuries that would not otherwise have occurred as a result of the action or inaction of these Defendants." (Doc. No. 158, PageID# 876 (citing *Jordan v. Keeble*, No. E2012-02478-COA-R3-CV, 2014 Tenn. App. LEXIS 193, at * (Mar. 27, 2014) (dismissing claim for failure to allege the elements under THCLA); then citing *Johnson v. United States*, Case No. 2:16-cv-02126,

2017 WL 4570317, at *4 (W.D. Tenn. Mar. 31, 2017 (dismissing malpractice claim because plaintiff failed to allege that the doctor-defendant breached any duty of care owed).)

The Court finds that Wellpath, Lewis, and Bailey have met their burden in establishing that Montgomery's medical negligence and malpractice claims fail as a matter of law. *See Celotex Corp.*, 477 U.S. at 323–24. ("The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.") Montgomery has not responded to their argument regarding the deficiencies of his THCLA claim. Accordingly, Wellpath, Lewis, and Bailey are entitled to summary judgment on Montgomery's medical negligence and malpractice claims.

### b. Negligence

Wellpath, Lewis, Jaynes, and Bailey argue that they are entitled to summary judgment on Montgomery's negligence claim against them for two reasons. First, Montgomery's negligence claim is subject to the THCLA because it "fully relate[s] to medical care by medical professionals" and Montgomery "has failed to meet the requirements to bring healthcare liability claims" against them. (Doc. No. 158, PageID# 877 (relying on *Gunter v. Lab. Corp. of Am.*, 121 S.W.3d 636, 641 (Tenn. 2003), for the proposition that "when a claim alleges negligent conduct which constitutes or bears a substantial relationship to the rendition of medical treatment by a medical professional, the medical malpractice statute is applicable. Conversely, when the conduct alleged is not substantially related to the rendition of medical treatment by a medical professional, the medical malpractice statute does not apply").) Second, Wellpath, Lewis, Jaynes, and Bailey argue that, if the Court does find that these allegations are subject to the THCLA, the negligence claim nonetheless fails as a matter of law because no record evidence supports a negligence claim. (Doc. No. 158.)

46

The Court need not address Wellpath, Lewis, Jaynes, and Bailey's first argument in favor of summary judgment because, construed as a negligence claim, Montgomery's claim fails as a matter of law. To establish a negligence claim under Tennessee law, a plaintiff must prove the following elements: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate or legal cause." *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 819 (Tenn. 2008) (quoting *West v. E. Tennessee Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005)). Wellpath, Lewis, Jaynes, and Bailey argue that Montgomery "has failed to establish how [their] conduct . . . fell below the standard of care that was owed to him" and how the alleged "violation of this standard was the cause in fact or proximate or legal cause of his injuries." (Doc. No. 158, PageID# 878.) Montgomery has not responded to this argument. Accordingly, Wellpath, Lewis, Jaynes, and Bailey are therefore entitled to summary judgment on that claim as a matter of law. *See Celotex*, 477 U.S. at 323–24.

### c.      Breach of Contract

Montgomery alleges that Wellpath failed to "provide meaningful medical and dental care[,]" which "constitutes a breach of contract as to [Montgomery]" as a 'third-party beneficiary' of the contract." (Doc. No. 78, PageID# 387, ¶ 37.) Wellpath argues that Montgomery's breach of contract claim against it fails as a matter of law because Montgomery had "failed to allege any facts supporting that he had a contractual right" and that the Court should dismiss it for the same reasons the Court dismissed that claim in its screening order and against Metro on Metro's motion to dismiss. (Doc. No. 158, PageID# 876.)

In its report and recommendation, the Court found that its screening order "dismissed Montgomery's breach of contract claims because Montgomery had not presented 'any factual allegations to support the existence of a . . . contractual right[.]" (Doc. No. 127, PageID# 669

(citing Doc. No. 9, PageID# 47) (alteration in original).) The Court found that Montgomery's allegations in his second amended complaint "ha[d] not alleged any additional facts that . . . cure[d] the deficiencies that led to the dismissal of the breach of contract claims in his initial complaint" and therefore "the breach of contract claims . . . should be dismissed." (Doc. No. 127, PageID# 669–70.)

Because the Court has already found that these facts, construed in the light most favorable to Montgomery, demonstrate that Montgomery has not alleged the existence of a contractual right—and because Montgomery has not offered any other argument or evidence to change that conclusion at summary judgment—Wellpath has carried its burden and is entitled to summary judgment on Montgomery's breach of contract claim.

### d. Intentional Infliction of Emotional Distress (IIED)

To establish a claim for IIED, Montgomery must show that: "the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 423 (6th Cir. 2020) (citing *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012)). Wellpath argues that it is entitled to summary judgment because Montgomery "has not presented allegations or evidence to show [that] he suffered a significant mental injury." (Doc. No. 158, PageID# 879.) Wellpath states that the Court dismissed Montgomery's IIED claim against Conrad for that reason, finding that "Montgomery ha[d] not alleged that he experienced any serious or severe mental injury that resulted from Conrad's actions" and that "Tennessee courts have limited recovery for IIED to mental injury that 'is "so severe that no reasonable [person] would be expected to endure it."'" (Doc. No. 127, PageID# 676–77 (quoting *Arnett v. Domino's Pizza I, L.L.C.*, 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003) (alteration in original).)

Montgomery has not responded to that argument and has not argued or presented record evidence that he suffered a significant mental injury. Montgomery has also not argued why the Court's analysis with respect to Wellpath should differ from its reason for dismissal of this claim against Conrad. Wellpath is therefore entitled to summary judgment on Montgomery's IIED claim against it.

## IV.     Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that Conrad's motion for summary judgment (Doc. No. 152) and the Wellpath and Metro Defendants' motion for summary judgment (Doc. No. 156) be GRANTED and that all other motions be denied as moot.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 30th day of May, 2024.

ALISTAIR E. NEWBERN
United States Magistrate Judge